Good morning. May it please the court, my name is Rebecca Pinnell representing Johnny Soliz. In this appeal, with respect to the trial issues, we've claimed errors in hearsay, confrontation violations, and vouching. But a lot of them merge together in that, of course, a hearsay violation can be a confrontation violation and a vouching violation can occur through introduction of extrajudicial information. So I'd like to sort of discuss them all together. Let me ask you something about the vouching. As I recall, there was no objection, is that right? That's right. What I was thinking was, if I were still a district judge and I heard that was going on, I'd be thinking to myself, hmm, that's getting kind of close to vouching. I wonder if there's going to be an objection. No objection. I wonder if defense counsel actually wants all this in because they're ready with some nasty surprise for the prosecution. I better let them try the case instead of me trying the case. So lest they object, I'm just going to let it go because they may be walking the prosecutor down the firm row's path. That just struck me as such a natural thing for a judge to think, that I'm inclined to take the lack of objection real seriously in this case. I understand the court's inclination. I think that because it happened several times and there wasn't some strong rebuttal, maybe the first time. I mean, I led people down the primrose path when I was defending. It's just one of the techniques you use. That may be the case at times, but I also think that this court's case law is pretty clear, that this isn't like a civil case where the judge is just the referee, not involved, I'm just going to call him. I think that the judge has an obligation. But vouching is great for the defense if you can get the prosecutor to marry the witness and then you can show the jury that anybody who'd marry this witness is a fool. But that wasn't the way it was going. Was this the case where the informant ended up running off with one of the agents, or have I got my facts wrong? No, that's not this case. That would have been a good fact for your case. That would have been a good fact. We'll save that for the next one. But there's just two that strike me as really bad, and that I can't imagine the judge wouldn't have at least called a sidebar and said, I've had that done to me. I've had that done to me. Are you intending to do this? Yes, Your Honor, it's fine. You can do it at sidebar. But the two that struck me as the most concerning was, one, letting the jury know that Johnny Solis' brother implicated him. That's a very damning fact. It didn't quite come out. There was objection, and every time there was objection, the judge cut things off in mid-sentence to where the jury never heard that. And as close as it came to the jury hearing, the judge admonished the jury, don't use that against this defendant. There was an objection initially when Inspector Rogers was testifying, but then the prosecutor just continued on and did exactly what the Supreme Court in Gray v. Maryland said was blatant, in that the prosecutor said, not naming any names, did Mike Solis tell you who actually committed the robbery? Yes. And that's like the Gray v. Maryland blank. At that point in time, was Johnny Solis the defendant in jail? Yes. At that point in time, did you think that your investigation was on the right track or wrong track? Right track. The Supreme Court in Gray v. Maryland said not only was that blank, which in essence that's what it was, was saying, not naming any names, did he tell you who did this? Yes. That's the Gray v. Maryland blank. And then they followed it up with the blatant, as the Supreme Court said, reference to Johnny Solis. At that point in time, Johnny Solis was already in jail. What other inference could the jury draw but that Mike Solis indicated? There was no objection to that line, right? No. There was an objection before that started. But let me sort of follow up on the early question Judge Kleinfeld asked, because I think it may be important to the disposition of this case. Generally also, there weren't too many confrontation clause objections either, were there? I know. Is that right? That's correct. Don't you think then both of those are plain error? Yes. I think that both of them are plain error, that this court has a duty, the district court has a duty to make sure that there aren't confrontation clause violations and there isn't vouching, particularly in a case like this where it just kept on going and I felt like it was snowballing as I was reading the record. Things just happened more and more. The second instance of out-of-court statements that I found particularly troubling was in Inspector Henney's testimony, and this occurred early on. During his direct examination, after he talked about the photographs, he talks about interviewing informants. At that point in time, Ray Pedroza was not involved in the case, so that reference to informants could not have been Ray Pedroza. He talked about interviewing family members of the suspect. He talked about interviewing other law enforcement officers. We know from what didn't get put forth at trial that there were law enforcement officers and other informants who didn't testify who said, that person in the photograph looks like Johnny Solis. That's what Inspector Henney was referring to. And then he says, based on that information, I made a photo montage and showed that to Maricela Suarez. So he was not talking about interviewing Maricela Suarez when he said that all these things led directly to Johnny Solis. Is it improper on direct examination to establish in order to tell, to sort of explain to the jury how the investigation was conducted, that the agent went out and interviewed a number of sources, and as a result of those interviews, he put together a montage and then showed the montage to the victim who picked out your client? That would have been subtly different. That would be a different scenario, but that's not what was said. He said, I interviewed these people, family members, not just law enforcement officers, not just looking at testimony. I interviewed family members. That's not true, is it not? It might be true, but those people didn't come to court. Those people were never cross-examined. As I understood the purpose of the testimony, maybe you would disagree, it was to sort of, as part of the race jest I, if that's appropriate, explain to the jury how the montage came to be and why it was that the investigation focused on Solis. I don't know that that's necessarily improper. It's improper. The investigation came to focus on Solis because a whole bunch of people who never testified said he did it. So, ladies and gentlemen of the jury. But so what? I mean, the jury's got to understand somehow how the defendant came to be here. To the extent that they had any doubts about the accuracy of the ID, to know that a bunch of other people said it was him too, and then she independently identified him. I still don't see why it matters. If the out-of-court testimony is used to obtain a conviction, of course, you've got a confrontation and hearsay clause, objection. If no objection is made, then ordinarily it's not reversible error for very good reason, because the defense is entitled to try its case. Here, the out-of-court testimony really didn't come in. A jury might infer that the policeman had heard some things out of court that led him to focus on Solis, but they were never presented with testimony to that effect by hearsay. And that sort of inference could just as well be something the defense wanted in, because it would show that the police picked their suspect too soon, before they investigated enough and were just going hammer and tongs after the wrong guy, had that been true.  I think you can present a photo montage to the jury without having to bring in the summary sort of thing. The comment is supposed to imply to the jury, oh, I just picked out six random pictures that I happened to have. You can certainly do it a lot more subtly than the way it was done in this case, to say the evidence led directly. It would be more subtle, but in the absence of some objection to channel things. So what if it's not so subtle? I mean, it really does put the district judge who's presiding over the trial in a very awkward situation. He's relying on the adversarial process to raise an objection when an objection is appropriate. And as Judge Kleinfeld was saying, he's got to guess as to whether or not there might be a strategy here that he doesn't understand that defense counsels pursue. Nevertheless, this court has reversed convictions under plain error in far fewer errors that occurred in this case. In this case. But to do that, don't we have to look at all the evidence as a whole? And if you could, I'd like you to spend a little time helping me on the in-court identification. I watched the video, and I saw the – I don't know that the photographs that were lodged do much justice. I actually think it might be helpful to have the originals so that we could see them. Mr. Hammond, I know, brought them. The originals were video. There are some additional ones. This certainly wasn't what was stressed, especially in closing argument, these photographs. The photographs were blurry. The photographs were unclear. The best you can tell from the photographs is it looks like a guy with, on some of the enhanced ones, a goatee and a big nose. Was there some kind of expert testimony from an FBI person? From a Target store's investigator that, you know, the guy had a bigger nose than normal, and he had a bushy goatee, and that you could tell that from the enhanced photography. And that's really – So that's why we have all those numbers on the photographs. I think he was also pointing out the cap and some other clothing items. So these were points of comparison that they wanted to – He wasn't allowed to testify to points of comparison, but sort of points where he found unique features. But getting back to Judge Tolman's point, which I think is an important one, you know, under plain error review, I mean, we really have to look at, right, how strong the case was. Well, but – After these errors. But this Court's cases say don't just look at that, but you look at whether or not there was unvouched testimony that supports the jury's verdict. And the unvouched testimony was just these photographs and the video surveillance, which I don't think anybody could say would sustain a jury's verdict. And that's why I think the government – You've got more than that, though. You've got eyewitness identification by the victim who expressed assurance that this is the man who robbed her. You've got the testimony of a cooperating co-defendant, however slimy and however biased, that I was sitting in the car and I watched him do the robbery. That's pretty strong evidence. Our position is both of those witnesses were vouched for and that extrajudicial information was brought in to back them up. Without objection. I mean, we're kind of back to the – it's a bit of a circular argument. Well, you know, as I said, it occurred several times and built up and built up. At some point, I think that the district court needs to get involved and make a record of it. Let's make a record of it so that we're not just in 2255 land on, you know, why do we have this. So I think it's clear by the end that there was money. This reminds me of the old joke. Judge, if you're going to try this case for me, I hope you win it. But there's certainly a middle of the road between what happened here, which was nothing. And one time there was an objection and it was just overruled. Every time there was objection, every time there was any attempt to get the judge to do something, it looks like he did the right thing. I can't find the errors. For example, when you've got these questions to try to sneak the brother's identification in without the brother saying it, he provided that his brother objection, Your Honor, calls for hearsay. It does call for hearsay. Sustained. Mrs. Hehir asked if you identified Mr. Your Honor. I moved to strike that answer. I don't think he answered. If he did, the jury is instructed to ignore that answer if he's answered. But then the government went in and asked the exact same thing, just doing the exact gray versus Maryland error. But isn't it incumbent on counsel at that point to leap back up and say, Your Honor, objection? You just sustained three objections to the same line of question. I think it's also incumbent on the judge, who also has an independent obligation to make sure that the defendant has his due process right to a fair trial and to effective assistance of counsel, to say, Hey, I just told you you couldn't do that, and you're doing it again. It's the lawyer's job, too, isn't it? Both. Both. If I can, I'd like to reserve the rest of my time. Counsel, please proceed. May it please the Court, Tom Hamlin, a parent of the United States. I would like to address the issues raised by counsel, but first I would like to point out that the evidence in this case was overwhelming. First, the government introduced testimony. It would be nice if the government had just used the evidence instead of trying to sneak in all the stuff that wasn't evidence. I mean, there's so much here where the government is trying to make the jury think, Hey, all this good stuff happened outside of court, and we would sort of like you to know, even though we can't tell you. Your Honor, I would point to the fact that the majority of this information that came from outside of the court was introduced by defense counsel during the examination of Inspector Rogers. Explain that to me. I missed it. Inspector Rogers was the first witness to testify in this case. The government focused the direct examination on the events of the investigation concerning Johnny Solis. The robbery occurred on January 17th. Mr. Solis' criminal complaint was filed on the 30th of that month. He was arrested the next day. That was the focus of direct examination. On cross-examination by defense counsel, defense counsel questioned Inspector Rogers as to the investigation of Johnny Solis and then went on to discuss the ongoing investigation, the investigation concerning co-conspirators Mr. Zuniga. At that point, defense counsel asked Inspector Rogers, tell me about a conversation that Raymond Pedroza had with Mike Solis. That was the first time the jury heard about this conversation. Defense counsel then asked Inspector Rogers, tell me about the tape-recorded conversations that your informant, Raymond Pedroza, had with Albert Zuniga. That's when those conversations started coming out. Through that cross-examination, defense counsel elicited that in one conversation, three people were discussed. The three people that were discussed in the Albert Zuniga recorded conversation were Albert Zuniga, Raymond Pedroza, and a person referred to as your boy. There was three people. Defense counsel on cross-examination. Your boy came out in the defendant's cross, not the direct? That's correct, Your Honor. In addition, then defense counsel tried to say, okay, well this conversation was inconsistent with another conversation, referring to the conversation that Mr. Pedroza had with Mike Solis, and defense counsel placed on the record there was four names discussed, Johnny Solis, Albert Zuniga, Raymond Pedroza, and Mike Solis. So it was defense counsel who put this information about these prior conversations into the record. So you think that the purpose was in order to suggest to the jury that they fingered the wrong guy, that there was actually another robber out there? That there was either another robber or to confuse the issue to say, look, defense counsel had already deferred this investigation of Johnny Solis. It was flawed. There was no search warrants. There was the girlfriend's residence. They made mistakes. They didn't do this. They didn't find fingerprints. And then they talk about the ongoing investigation and say, this is flawed. You have these different conversations. You have witnesses talking about this or talking about that. So I believe it was an attempt from the government's perspective to confuse the jury, to bring up these other conversations. Mr. Hanlon, let me ask you to return to your opening sentence and expand on that sentence that the evidence was overwhelming. Thank you, Your Honor. Evidence of guilt, I mean, right? Yes, Your Honor. What do you mean by that? Tell me. First, the government introduced testimony of Raymond Pedroza, a person that testified that he has known the defendant and his family for over 20 years. Raymond Pedroza testified that the defendant told him prior to the robbery that he was going to pull this robbery off. Pedroza testified the defendant told him when and where he was going to commit the robbery. Raymond Pedroza testified he didn't really think he was going to do it. He then went out to the hideaway bar, which is located across from the post office. He then saw the defendant walking on a street adjacent to the large postal truck. He testified that he saw the defendant walk up to the post truck. But Pedroza got some kind of deal from the government, right? That's correct, Your Honor. He did get a plea deal. He had been charged with being a felon in possession of a firearm. And he had several prior felony convictions. The felony convictions were old. He'd been out of prison for 18 years. Raymond Pedroza testified that he saw the defendant approach the truck, walk away, come back a second time, disappear behind the truck, jump out on the passenger side carrying an object. All of the descriptions provided by Pedroza, who testified he never saw the videotape, were consistent with the videotape, where the suspect walks up, leaves, walks back again, and then must have jumped off the passenger side because the video clearly shows the driver's side of the vehicle. In addition, Raymond Pedroza's descriptions of the events that night were also consistent with the victim, who testified, and if you watch the videotape, you can see. Okay, bad witness with a deal basically says he saw him do it. Saw him do it, and he told him he was going to do it. Next, you have the testimony of Marcella Suarez. Ms. Suarez testified that she saw the defendant in the back of the truck. She's a postal worker. That's correct, Your Honor. She's a highway contract driver with the United States Postal Service. He's the victim, right? That's correct, Your Honor. She testified that the defendant grabbed her by the hair, pulled her face right up to his face, 12 inches from her face, and that his face was well-illuminated by the floodlights. She was looking directly into his face. Ms. Suarez, or Inspector Rogers, testified he showed the photo montage to Ms. Suarez. He testified on direct examination she took her hands in a triangular pattern and she looked over each photograph individually. When she got to photograph number five, the photograph of the defendant, Inspector Rogers testified, she was visibly shaken. She was visibly upset, and she identified that was the person that robbed her. In addition, Ms. Suarez testified in open court that not only was she 100% positive that the defendant was the person that robbed her, she also testified that since the robbery, she had had dreams, I would imply that they were actually nightmares, but she had dreams where she constantly saw the suspect's face in her mind. There was no hesitation whatsoever. She says, I was robbed and he's the guy that did it. That's correct. And she saw him with no mask and decent light. That's correct, from a distance of 12 inches, Your Honor. Third, in regards of the evidence in this case, I would point to the testimony of the defense expert, Dr. Jeffrey Lofkus. Dr. Lofkus talked about the photo montage. He talked about, most importantly, what's known as attentional narrowing. Dr. Lofkus talked about if there's an emotional event, such as a robbery, that's accompanied by this theory of attentional narrowing. He used a metaphor of attention in that situation as a spotlight, that the victim focuses on whatever's directly in front of them. He testified, for example, if someone had a gun and they pointed a gun at you, the victim in that scenario would focus on the gun, not on the suspect's face. He agreed that if a suspect were to grab a victim, grab her by the hair and pull her right up to his face, that that is an example of attentional narrowing. Dr. Lofkus was called as the defense expert on eyewitness identification? That's correct, Your Honor. He's the ex-husband of Dr. Elizabeth Lofkus? That's correct, Your Honor. So he's continued on her work? That's correct, Your Honor. And he testified, I believe, as to an article that he wrote with Elizabeth Lofkus, as well as another expert in the field. In addition, Dr. Lofkus talked about a properly done and unbiased... Even though he was a defense expert, he says, in this situation, his face would really be salient to you. From the government's perspective, he was an excellent witness. In this case, this theory of attentional narrowing, and as the government pointed out in the closing argument, that's exactly what happened here, that the victim focused on the face from 12 inches away. So usually the Lofkus' are a problem for the government because they tend to be very persuasive, important experts on memory. That's correct, Your Honor. In this case, he's nailing the defendant. Absolutely, Your Honor. Between attentional narrowing and then testifying that a properly done and unbiased photo montage is a genuine test of a person's memory. That was exactly what happened in this case. What did he have to say about the montage? He had testified that he never saw the montage prior to testifying, but he had talked about individuals' memories, so he was asked about photo montages. But he wasn't shown the montage that was actually used? I can't recall, Your Honor, if he was shown the montage or not, but he did talk about when a montage is unreliable, is when an officer who is familiar with the case suggests, not purposely, but they may suggest who an individual is in the photo montage, and the victim may learn from that and, you know, end up picking that person. But in this case, the postal inspectors didn't speak Spanish, so they had to bring in, and it's on the record, a community corrections officer, Martinez, who knew nothing about the case. Officer Martinez testified he had no idea who the suspect even was in this photo montage. His job was to come in, read the admonition in Spanish, and show it to the victim. And that's what happened here. Therefore, because I got to tell you, I looked at that montage, and that's one of the best montages I've ever seen. I had seen a booking photo of this guy and the videotape, and I looked at the montage, and I couldn't pick out which was his picture. I would agree with the court, Your Honor, and Inspector Henney testified about the process of trying to get through all these photographs to find similarly looking people to put together this photo montage. In addition, the last two points. The guy who actually showed the montage to the witnesses did not know who was supposed to be the bad guy? That's correct, Your Honor, and that's all on the record. Kind of a double-blind experiment. Next, Your Honor, the jury heard from forensic video analyst Eddie Burns. Mr. Burns is from the Target Corporation, a private company. He testified that he was able to take this videotape, he was able to obtain 300 different photographs of the suspect. He testified that this was a good quality videotape. He then took five of those photographs, which was Government's Exhibit No. 24, and he put them onto a CDR. He then took those photographs and he was able to enhance them based upon unique facial characteristics. That was Government's Exhibit No. 25. I previously submitted a supplemental excerpt to Record No. 5. That was a CDR copy of the original. The government presented the CDR because you lose so much resolution when you print down the paper. I did receive an order from the court to bring the original. I brought the original as well as copies and provided those to counsel, and I can hand them to the clerk at the conclusion, Your Honor. You would give them to the clerk. I was the one who wanted to take a look at the original. Certainly, Your Honor. And lastly, I would point out that the robbery in this case was captured on videotape. Certainly the videotape is not unmistakably clear, but I would point out that the jury in this case had three days to observe the defendant, to observe the parties. At the conclusion of the case, the jury rested at 4.04 p.m. when they received the case. They came back with two questions. They wanted to review the videotape, and they wanted to take a look at the enhanced photographs. They were allowed to view the videotape in court. They were allowed to take a look at the photographs. The jury returned a verdict in this case in less than two hours. That's the evidence that was presented in this case. To address the issues raised by counsel, I'd like to start with the arguments regarding the improper bolstering, if I may address a few of those. I believe both counsel agree there were no objections. It's a plain error standard in this case. The first allegation is that Inspector Rogers stated that he was confident in his investigation. I think it's important to look at the context of his comment. As I indicated earlier, Inspector Rogers testified as to this investigation of Johnny Solis. On cross-examination, defense counsel asked about this investigation and then stated, and as the judge noted, defense counsel strayed far beyond the scope of direct examination, except to record 227. Defense counsel advised he had questions concerning the ongoing investigation, the Albert Zuniga investigation. At that point, defense counsel asked a number of questions about the ongoing investigation. The government then asked Inspector Rogers regarding the ongoing investigation to co-conspirators if he was confident in that investigation. Lastly, the next allegation by bolstering by personal assurances is that Inspector Henney testified that he identified the person who committed the robbery. That was the part that struck me as funny. I mean, who cares if he's confident? I don't care if he's confident, just if he's right. And the jury was aware, Your Honor, as well, that Inspector Henney and Inspector Rogers, they were the ones that conducted this investigation. They were the ones that reviewed the video over 12 times. I mean, confident just talks about his feelings, not whether he's right. That's correct, Your Honor, and Inspector Henney, he testified that he, in fact, arrested the defendant. So I certainly think the jury would infer that he believed that he identified the person who committed the robbery because he, in fact, arrested the defendant on January 31st. Next, the defendant alleges that the government asked Rogers and Henney to comment on the reliability of witnesses and that Inspector Rogers testified that Marcella Suarez's statements were consistent. Inspector Rogers was recalled by the defense as part of their case. At that time, defense counsel specifically asked Inspector Rogers, tell me about the descriptions that the victim provided to you on the two separate occasions. Inspector Rogers was then provided with a drawing on a board with a magic marker, all of the descriptions provided by the victim. On cross-examination, the government asked Inspector Rogers, you received descriptions of the robber from the victim. Were they consistent or inconsistent? He testified that they were very consistent. There's nothing about the statement from Inspector Rogers that the government is assuring his reliability or his truthfulness by him saying these two descriptions provided were consistent during the investigation. Defense counsel and the government have cited the same cases regarding when a prosecutor vouches or offers his personal assurances. All of those cases, Kerr, Rudberg, McCoy, Brooks, and Hermanack, are all distinguishable from the present case. In those cases, the government offered personal assurances as to the credibility of witnesses. The government advised the jury that there was an investigator in the back of the courtroom who could guarantee that an individual was telling the truth. None of that happened in this case. The defendant alleges that the government engaged in improper bolstering by extrajudicial information. I would point out again that all the conversations that occurred outside of court, all that information was brought in by defense counsel in this case. The defendant argues today that the strongest or most egregious point is that Mike Solis, the brother of Johnny Solis, implicated him in the robbery. I would point out that the government, not only in closing arguments but in cross-examination and redirect examination of Inspector Rogers, pointed out that the information that had been provided by Mike Solis was not true. He didn't provide truthful information regarding this investigation. And the government also highlighted on multiple occasions that any information that came from Mike Solis came after the arrest of Johnny Solis. Nothing in that information led to the arrest of the defendant in this case. I see that my time is out. And if I may, at the conclusion, hand over those photographs to your clerk. Thank you very much. Thank you, counsel. Your Honor, the government elicited from a non-percipient law enforcement officer that he was confident in his investigation. That's a personal assurance that the defendant is guilty. That's vouching in its simplest form. And it's frustrating that the government isn't taking a position, well, there was just no objections and this is just a plain air case. There was no error according to the government. But, Ms. Melton, even if I agree with you that it was impermissible, we still have to do a harmless error analysis. And Mr. Hanlon did a pretty good job of laying out a pretty strong case. And so the question is, in the face of all of that evidence, even if there was vouching, did it rise to such an error that we have lacked confidence in the verdict? And I understand the court feels that way. I, for one, I'll tell you when I – It's not how I feel. I mean, that's the standard of law. I know. That's the standard of law. I would pay it for the defense if the felonies committed on television. True. But if it were just the video, that would be a different thing. I mean, I, for one, in this case, quite frankly, when this case was – I didn't try the case, but when it was going towards trial and I – You wouldn't have allowed that to occur, I'm confident. Dang right. No. I'd heard all these people had identified Johnny Salese before the victim was shown the photograph. And I thought, wow, that's really strong evidence that it might be him, if all these people have identified him prior to it. That, to me, if I was sitting on the jury, would be very strong evidence that we all know that victims get things wrong when they see things. Regardless of the strength of Dr. Loftus' testimony or weaknesses, eyewitnesses who are experiencing crimes get things wrong. I failed all those law school experiments on that. The defense expert actually helped the government more than it hurt the – more than it hurt. You know, in – I know that that's the government's position, and that's not – Dr. Loftus is a pretty persuasive expert. I've had him on the stand myself, as well as his former wife, and they're very good at what they do. I've worked with him as well. There were, nevertheless, some problems with Maricela Suarez's testimony. For instance, in her first statement, she says that she sees Mr. – the defendant or the assailant – while he's walking away from her. That's when she first sees him, and she mostly sees him from behind. And she says that right the day after that the assault occurs. And then in June, when she's interviewed, she says, I remember this event better now than I did back then. Well, Dr. Loftus would say that that's not real memory. That's created memory. And then she adds, at that point in time, that she saw him face-to-face. That's the first time she says the face-to-face. And that, to me, is an important distinction. And so how do you differentiate her having this person in her dreams and having this videotaped memory, which Dr. Loftus says that's not the way memory works, coming from the photo montage as opposed to what she actually saw? There's a real danger there. And Inspector Rogers was allowed to say, look, these inconsistencies are typical for victims, and I nevertheless find her consistent. So he was allowed to vouch for her and vouch for these inconsistencies as just being normal, typical. Counsel, you are over time. I thank you, Your Honor, and we'd ask that the Court remand the case for retrial. Thank you. Thank you, Counsel. Thank you. United States v. Solis is submitted. Thank you, both of us. Very well argued. Appreciate it.
judges: Kleinfeld, Tashima, Tallman